IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 28, 2015 Session

## LAMAR TENNESSEE, LLC DBA LAMAR ADVERTISING OF KNOXVILLE v. CITY OF KNOXVILLE, TENNESSEE, ET AL.

**Appeal from the Chancery Court for Knox County**
**Nos. 167922-2 and 167920-3      Daryl R. Fansler, Chancellor**

_____

**No. E2014-02055-COA-R3-CV-FILED-FEBRUARY 25, 2016**
_____

In 2006, Lamar Tennessee, LLC began the conversion of two of its billboards from "vinyl-faced" to "digital display" utilizing light-emitting diode (LED) technology. Before Lamar could complete these conversions, a sign inspector for the City of Knoxville issued a stop-work order on each of the billboards. A zoning inspector for the City, in her own name, subsequently filed a complaint against Lamar, grounded in Tenn. Code Ann. § 13-7-208(a)(2) (Supp. 2005), seeking temporary and permanent injunctive relief prohibiting Lamar from "repurposing" the two vinyl-faced billboards into billboards featuring LED digital displays. In response, Lamar filed a complaint against the City seeking a declaration that the two billboards were not in violation of the zoning regulations and/or that the provisions of the zoning regulations pertaining to billboards with digital displays were unconstitutional. These cases were eventually consolidated. Each party filed a motion for summary judgment. The trial court granted the City's motion and permanently enjoined Lamar from converting the billboards at issue from vinyl structures into billboards with LED digital displays. Lamar appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Gregory P. Isaacs and Craig Justus, Knoxville, Tennessee, for the appellant, Lamar Tennessee, LLC dba Lamar Advertising of Knoxville.

Nathan D. Rowell and Brian R. Bibb, Knoxville, Tennessee, for the appellee, City of Knoxville, Tennessee.

**OPINION**

**I.**

Lamar has owned and operated many billboards in the Knoxville area for several years. Two of these billboards are central to the present case, *i.e.*, one located at 6739 Kingston Pike and the other at 406B North Peters Road. When they were originally constructed, they were vinyl and non-electronic. Both were properly permitted by the City. In addition, each was a free standing structure, which is to say that neither was attached to a building or business lot. Lamar rented these billboards to companies and individuals for off-premises advertising.

Effective June 1, 2001, the City, by ordinance, prohibited the issuance of permits for the construction of billboards at new locations. Pursuant to the City's ordinance, all billboards lawfully existing prior to June 1, 2001, were deemed to be legal preexisting "nonconforming" structures. Both of the billboards at issue in this case were fully constructed, permitted, and in operation prior to June 1, 2001.

In advance of a City Council meeting scheduled for December 7, 2004, the City's Metropolitan Planning Commission (MPC) prepared and distributed an "Agenda Information Sheet" describing the background for the Council's consideration of a proposed ordinance to amend the City's zoning regulations pertaining to electronically-operated message boards:

> City Council approved a resolution establishing a moratorium on the issuance of permits for electronic message centers, or boards, with an effective date of August 17, 2004. The moratorium was in response to concerns over the permitting of several new signs in several commercial areas. City Council adopted the moratorium so that the full impact of these signs on the community could be examined. As a part of this process, an eighteen-member panel was created to compile and review information, including the types of controls that other communities have used to regulate these devices. Included on the panel were City Council representatives, City administrative and MPC staff, local business persons, sign contractors, and interested citizens.

2

The committee met on several occasions during the past two months, and the attached amendments [to the City's zoning regulations] are the result of the committee's deliberations.

At the Council meeting on December 7, 2004, the City enacted Emergency Ordinance No. O-241-04, which made various amendments to the City's zoning regulations, some of which are pertinent to the present case. First, the City by its ordinance defined what constituted an electronic message center (EMC).[1] Second, the City replaced subpart 3 of Article V, section 10 with the following language: "No sign shall have moving parts. No signs except electronic message center (EMC) shall have red, green, yellow, amber, or blue lights." Third, the City added subpart 4 to Article V, section 10, which states as follows: "No sign shall have flashing or blinking lights other than electronic message centers (EMC), or a documented historic or reproduction sign located in an H-1 (Historic Overlay) District, which has received a certificate of approval from the Knoxville Historic Zoning Commission." Fourth, the City amended the section of the zoning regulations regarding commercial districts and added Article V, section 10(E)(1)(e)(4): "An EMC shall be permitted as a wall sign, or an integrated part of the total sign surface of a free standing business sign." Finally, the City made the same identical addition to the section regarding industrial districts by adding Article V, section 10(G)(5)(e).

Other ordinances impacting the issues in this case were to follow. In March 2007, the City enacted Ordinance No. O-64-07, which rezoned an area of the Central Business Improvement District and created a Downtown Design Overlay (D-1) District. In October 2007, the City enacted Ordinance No. O-236-07, which amended Article V, section 10(A)(4) of the City's zoning regulations to allow signs with flashing or blinking lights in the D-1 District provided they had "received approval from the Downtown Design Review Board as being compatible and in character with the Downtown Design Guidelines and surrounding established development." Thereafter, in August 2008, the City enacted Ordinance No. O-166-08, which formally adopted the "Downtown Knoxville Design Guidelines."

On March 24, 2009, the City enacted Ordinance No. O-37-09, which amended Article V, section 10 of the City's zoning regulations. Under the general regulations of subsection A, the City inserted the following language:

_____

[1] An EMC is defined, under Article II of the City's zoning regulations, as a "sign which uses a bank of lights that can be individually lit to form copy such as words, letters, logos, figures, symbols, illustrations, or patterns to form a message without altering the sign face."

4. No sign shall have scrolling, intermittent, flashing, running or blinking lights or animated illumination except:

(1) A documented historic or reproduction sign located in an H-1 (Historic Overlay) District, which has received a certificate of appropriateness from the Knoxville Historic Zoning Commission.

(2) A sign within the D-1 (Downtown Design Overlay) District, which has received approval from the Downtown Design Review Board as being compatible and in character with the Downtown Design guidelines and surrounding established development.

Under the regulations for commercial districts contained in subsection E, the City inserted the following relevant language pertaining to EMCs:

e. Electronic Message Centers (EMC) legally existing on [the effective date of this ordinance]. After [the effective date of this ordinance], no EMC shall be permitted in any location except:

1. An EMC may be permitted in those areas covered by an H-1 overlay district subject to approval as required within an H-1 district.

2. An EMC may be permitted in those areas covered by a D-1 overlay district subject to approval as required within a D-1 district.

*   *   *

2. Within all commercial districts the following regulations shall apply to Electronic Message Centers (EMC).

a. EMCs legally existing on [the effective date of this ordinance] shall be allowed to continue

4

operation subject to meeting the operational standards as required by subsection (m) herein. After [the effective date of this ordinance], no EMC shall be permitted in any location except in the following instances:

(1) An EMC may be permitted in those areas covered by an H-1 overlay district subject to approval as required within an H-1 district.

(2) An EMC may be permitted in those areas covered by a D-1 overlay district subject to approval as required within a D-1 district.

(3) An EMC may be permitted in those specific zone districts that allow EMCs with approved design regulations or guidelines subject to approval by the appropriate regulatory body for such district.

(4) An EMC may be used as a changeable price sign[.]

\* \* \*

d. An EMC shall be permitted as a wall sign, or an integrated part of the total sign surface of a free standing business sign[.][2]

---

[2] Under Article II of the City's zoning regulations, a business sign is defined as a "sign which directs attention to the business or profession conducted on the premises. A 'for sale,' 'to let' or 'information' sign shall be deemed a business sign."

(Footnote added.)  Under the regulations for industrial districts contained in subsection G, the City inserted the following language:

5.  Within all industrial districts the following regulations shall apply to Electronic Message Centers (EMC).

a.  EMCs legally existing on [the effective date of this ordinance] shall be allowed to continue operation subject to meeting the operational standards as required by subsection I herein. After [the effective date of this ordinance], no EMC shall be permitted in any location except:

(1)  An EMC may be permitted in those areas covered by an H-1 overlay district subject to approval as required within an H-1 district.

(2)  An EMC may be permitted in those areas covered by a D-1 overlay district subject to approval as required within a D-1 district.

(3)  An EMC may be permitted in those specific zone districts that allow EMCs with approved design regulations or guidelines subject to approval by the appropriate regulatory body for such district.

(4) An EMC may be used as a changeable price sign[.]

\*     \*     \*

d. An EMC shall be permitted as a wall sign, or
an integrated part of the total sign surface of a
free standing business sign[.]

The effect of these various ordinances was to limit, restrict, and regulate the creation of electronically-operated message boards in the city of Knoxville.

In 2006, Lamar decided to convert its vinyl billboards at 6739 Kingston Pike and 406B North Peters Road into billboards featuring LED digital displays. Prior to these conversions, Anita Cash, a zoning inspector for the City, received information that Lamar was "repurposing" these structures. Cash discussed these intended conversions with the sign inspector for the City, Scott Brenneman, who issued a stop-work order for each location.[3] Thereafter, on September 13, 2006, Cash, in her name and in her official capacity as a zoning inspector for the City, filed a complaint in the trial court against Lamar seeking temporary and permanent injunctive relief to prevent Lamar from repurposing these two billboards. That same day, Lamar filed a complaint against the City – also in the trial court – for a declaratory judgment, asserting that (1) Lamar's billboards at 6739 Kingston Pike and 406B North Peters Road did not violate the City's zoning regulations; (2) Article V, section 10 of the City's zoning regulations constituted an unconstitutional restriction on commercial speech; (3) Article V, section 10 of the City's zoning regulations violated the First and Fourteenth Amendments to the United States Constitution; and (4) the City's zoning regulations were vague and overly broad. Cash amended her complaint on September 14, 2006, to indicate that Lamar never submitted an application to obtain appropriate permits from the City for the subject billboards. On September 15, 2006, the trial court issued a restraining order stating that Lamar was "temporarily restrained from erecting, constructing, reconstructing, altering, converting, maintaining or using [EMCs] on off-premise advertising signs/billboards at or around [the two locations] in violation of Knoxville City Code Article 5, Section 10(A)(4) and (E)."

The parties agreed to stay the proceedings in these cases while the City considered whether to amend its zoning regulations regarding billboards with digital displays. In response to a request by Lamar, the mayor's office, in February 2007, appointed a Digital Display Billboard Study Commission to examine this issue. Mark Donaldson, the director of the MPC, testified that the MPC subsequently recommended that the City

---

[3] The September 12, 2006 stop-work order issued for 6739 Kingston Pike indicated that Lamar had "[i]nstalled 'EMC' on an advertising billboard which is not a permitted use." The September 6, 2006 stop-work order for 406B North Peters Road stated, "EMC being installed without permit[.]"

Council "allow carefully regulated digital billboards in a scheme that required the overall reduction of the number of billboards in town, based on ratio." The City Council, however, declined to vote on the recommendation. In early 2008, the MPC renewed its recommendation. Again, the City Council refused to vote on the proposal. In June 2008, Lamar requested that the Board of Zoning Appeals (BZA) hear its appeal regarding the City's decision to issue stop-work orders for the subject billboards. On August 21, 2008, the BZA voted to deny the appeal.

On October 18, 2011, the trial court entered an order consolidating Cash's action against Lamar with Lamar's action against the City. Thereafter, Lamar filed an amended complaint on November 6, 2008, alleging that (1) its proposed LED digital displays did not violate the City's zoning regulations; (2) Tenn. Code Ann. § 13-7-208 authorized the proposed LED digital displays; (3) Article V, section 10 of the City's zoning regulations was an unconstitutional restriction on speech in violation of the First Amendment to the United States Constitution and Article I, Section 19 of the Tennessee Constitution; and (4) portions of the City's zoning regulations pertaining to billboards were overly broad and void for vagueness in violation of the equal protection clauses of the United States and Tennessee Constitutions. On September 3, 2013, Lamar filed a second amended complaint that raised three new allegations: (1) that sections of the City's zoning regulations pertaining to billboards with digital displays were preempted by Tenn. Code Ann. § 54-21-122 (Supp. 2007); (2) that the City's zoning regulations regarding billboards with digital displays were beyond the City's statutory authority because those regulations failed "to promote the health, safety, morals or welfare in accordance with the zoning enabling legislation [in Tenn. Code Ann. § 13-7-201 *et seq.*];" and (3) that the City's zoning regulations for billboards with digital displays violated the due process clause contained in Article I, Section 8 of the Tennessee Constitution.

On September 30, 2013, the City filed a motion for summary judgment, alleging that (1) Lamar's plan to convert vinyl billboards at two locations into LED digital displays would violate the City's zoning regulations; (2) the City has the authority to enact these zoning regulations, which do not conflict with state law; (3) the City's zoning regulations are not unconstitutionally vague, but rather constitute permissive time, place, and manner restrictions of commercial speech; (4) the City's zoning regulations do not violate the principles of equal protection; and (5) the City's zoning regulations represent a constitutional exercise of the City's police power.

On October 1, 2013, Lamar filed a motion for summary judgment, in which it argued (1) that the sections of the City's zoning regulations regarding digital billboards were preempted by state law; (2) that the City's actions were in excess of its statutory authority; (3) that the City's regulations pertaining to digital signs are arbitrary

restrictions without a reasonable basis, in violation of due process principles; (4) that the City granted certain exceptions for digital billboards without any reasonable basis in violation of equal protection principles; and (5) that the City's regulations for billboards with digitals displays impermissibly restricted speech in violation of the First Amendment to the United States Constitution. Lamar's motion renewed all of its prior arguments in the complaint, first amended complaint, and second amended complaint.

On September 29, 2014, the trial court filed a memorandum opinion and order that granted the City's motion and denied Lamar's. First, the trial court determined that Tenn. Code Ann. § 54-21-122 did not preempt the sections of the City's zoning regulations regarding billboards with digital displays because the statute merely sets forth the minimum requirements for allowing billboards with digital displays. The court held that the statute works in conjunction with the City's supplemental zoning regulations, which are permitted pursuant to Tenn. Code Ann. § 13-7-201 (Supp. 2001). Second, the trial court concluded that Lamar's billboards at the subject locations are not entitled to protection under Tenn. Code Ann. § 13-7-208 because a conversion from a vinyl display to a LED digital display would constitute an impermissible change in the use of the land at both locations. Third, the court held that the City's zoning regulations pertaining to billboards with digital displays were content-neutral restrictions that furthered the City's legitimate interests in promoting public safety and maintaining esthetics without foreclosing alternate channels of communication. Fourth, the trial court dismissed Lamar's contention that the City's regulatory scheme amounted to a prior restraint on free speech. The trial court concluded that Lamar had failed to prove exactly how the City had "unfettered" discretion when granting exceptions to its restrictions on billboards with digital displays in certain areas. Fifth, the trial court determined that Lamar had failed to provide any evidence, beyond a generalized allegation, that the sections of the City's zoning regulations pertaining to billboards with digital displays were void for vagueness. Sixth, the trial court stated that the City did not violate Lamar's right to due process after finding that the City's restrictions on billboards with digital displays bore a sufficiently reasonable relationship to its police power and were neither unreasonable nor oppressive to Lamar as a property owner. In addition, the trial court reasoned that Lamar's right to equal protection was not violated, as the City had enacted new rules in its zoning regulations that applied to everyone, not just Lamar. Finally, the trial court concluded that the City's zoning regulations pertaining to billboards with digital displays were not beyond the scope of the City's statutory authority after determining that those regulations were clearly enacted with the general welfare, safety, and health of the community in mind.

**II.**

Lamar filed a notice of appeal on October 14, 2013, raising the following issues, as taken verbatim from its brief:

> Whether the chancery court erred in failing to conclude that the City of Knoxville's ban on billboards that display messages by means of digital display is in direct conflict with state law expressly permitting such activity and therefore is preempted.
>
> Whether the chancery court erred in holding that the outdoor advertising structures at issue are not pre-existing, non-conforming establishments pursuant to T[enn]. C[ode] A[nn]. § 13-7-208, and accordingly Lamar is allowed to expand, and/or destroy and reconstruct these outdoor advertising structures to include a digital face display.
>
> Whether the chancery court erred in stating that digital displays on billboards were prohibited by Knoxville Code section 10(A)(3) for being signs with moving parts and section 10(A)(4) for being signs having flashing or blinking lights since such findings are unsubstantiated by the pleadings and evidence.
>
> Whether the chancellor erred in holding that the City of Knoxville['s] zoning ordinance was not an unlawful restriction on commercial and non-commercial speech in violation of the First Amendment to the United States Constitution and Article I, Section 19 of the Tennessee Constitution.
>
> Whether the chancellor erred in holding that the City of Knoxville['s] zoning ordinance prohibiting billboards with digital displays did not constitute a prior restraint on speech which is content-based and in violation of the First Amendment to the United States Constitution and Article 1, Section 19 of the Tennessee Constitution.

Whether the chancery court erred in holding that the City of Knoxville's ban on using digital technology on billboards is not ultra-vires and in excess of statutory authority for failing to promote the health, safety, morals and welfare in the zoning enabling legislation of [Tenn. Code Ann.] § 13-7-101 and the purposes of zoning in the City's charter.

Whether the chancellor erred in holding that [the] City's ban on digital displays on billboards did not violate the due process and equal protection guarantees of Article I, Section 8 of the Tennessee Constitution.

Whether the chancellor erred in holding that the City of Knoxville['s] ordinance prohibiting billboards with digital displays is not [overly] broad and void for vagueness.

Whether Lamar is entitled to damages from the City of Knoxville as a result of the constitutional violations arising from the City's enactment and enforcement of the ban on digital display on billboards.

(Lettering of paragraphs in original omitted.)

## III.

On the issue of summary judgment, we are guided by the following principles as previously articulated by the Supreme Court:

A summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008). When ruling on a summary judgment motion, the trial court must accept the nonmoving party's evidence as true and resolve any doubts concerning the existence of a genuine issue of material fact in favor of the nonmoving party. *Shipley v. Williams*, 350 S.W.3d 527, 536 (Tenn. 2011) (quoting *Martin v. Norfolk S. Ry.* [*Co.*], 271 S.W.3d 76, 84 (Tenn. 2008)). "A grant of summary judgment is appropriate only when the facts and the

11

> reasonable inferences from those facts would permit a reasonable person to reach only one conclusion." ***Giggers v. Memphis Hous. Auth.***, 277 S.W.3d 359, 364 (Tenn. 2009) (citing ***Staples v. CBL & Assocs., Inc.***, 15 S.W.3d 83, 89 (Tenn. 2000)). "The granting or denying of a motion for summary judgment is a matter of law, and our standard of review is de novo with no presumption of correctness." ***Kinsler v. Berkline, LLC***, 320 S.W.3d 796, 799 (Tenn. 2010).

***Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.***, 395 S.W.3d 653, 671 (Tenn. 2013); *see also* ***Rye v. Women's Care Ctr. of Memphis, MPLLC***, — S.W.3d —, 2015 WL 6457768, at *12, *22 (Tenn., filed Oct. 26, 2015).

### IV.

In 1965, the United States Congress enacted the Federal Highway Beautification Act. 23 U.S.C. § 131 (1965). This legislation is intended "to protect the public investment in . . . highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. § 131(a). In order to accomplish these objectives, Congress decided to withhold federal aid highway funds from individual states that did not pass legislation to maintain "effective control of the erection and maintenance" of "outdoor advertising signs, displays, and devices" along the interstate system. 23 U.S.C. § 131(b). Pursuant to this mandate, the General Assembly passed the Billboard Regulation and Control Act of 1972 (the 1972 Billboard Act), codified at Tenn. Code Ann. § 54-21-101, *et seq*.

At an earlier time, beginning in 1935, the General Assembly had authorized local governmental entities "to enact zoning restrictions governing the use of the land." ***Shore v. Maple Lane Farms, LLC***, 411 S.W.3d 405, 426 (Tenn. 2013). "Tenn. Code Ann. § 13-7-101(a)(1) explicitly empowers county legislative bodies to enact zoning restrictions governing property in the portions of such county which lie outside of municipal corporation." ***Id.*** (internal quotation marks omitted). As a result, "[l]ocal governments' power to employ zoning measures to control the use of land in their boundaries is now firmly established." ***Lafferty v. City of Winchester***, 46 S.W.3d 752, 757-58 (Tenn. Ct. App. 2000) (citing ***Draper v. Haynes***, 567 S.W.2d 462, 465 (Tenn. 1978)). Local governments presently utilize zoning regulations as the most common mechanism for controlling the use of local land. ***Lafferty***, 46 S.W.3d at 758 (citing 1 Am. Law of Zoning § 1.14)).

Tenn. Code Ann. § 13-7-201(a)(1) states, in pertinent part, as follows:

12

> For the purpose of promoting the public health, safety, morals, convenience, order, prosperity and general welfare, the board of aldermen, board of commissioners or other chief legislative body of any municipality by whatever title designated . . . is empowered . . . to regulate the location, height, bulk, number of stories and size of buildings and other structures, the percentage of the lot which may be occupied, the size of yards, courts and other open spaces, the density of population, and the uses of buildings, structures, and land for trade, industry, residence, recreation, public activities and other purposes[.]

Tenn. Code Ann. § 13-7-201(a)(1). Billboards qualify as "structures" for the purposes of Tenn. Code Ann. § 13-7-201(a)(1). *See **Town of Collierville v. Town of Collierville Bd. of Zoning Appeals***, No. W2013-02752-COA-R3-CV, 2015 WL 1606712 (Tenn. Ct. App. W.S., filed Apr. 7, 2015). In addition, prior case law has made it clear that the regulation of billboards has a tangible link to public safety: "We have recognized that state interests in traffic safety and esthetics may justify zoning regulations for advertising." ***Lorillard Tobacco Co. v. Reilly***, 533 U.S. 525, 551 (2001) (citing ***Metromedia, Inc. v. San Diego***, 453 U.S. 490, 507-08 (1981); ***St. Louis Poster Adver. Co. v. St. Louis***, 249 U.S. 269, 274 (1919); ***Thomas Cusack Co. v. Chicago***, 242 U.S. 526, 529-31 (1917)).

As previously noted in this opinion, the City, pursuant to its authority to regulate under Tenn. Code Ann. § 13-7-201(a)(1), enacted ordinances in 2004 that (1) prohibited signs from having moving parts; (2) stated that no signs, other than EMCs, shall utilize red, green, yellow, amber, or blue lights; and (3) prevented signs, other than EMCs and documented historic or reproduction signs located in an H-1 District with a certificate of approval from the City's Historic Zoning Commission, from featuring flashing or blinking lights. In addition, the City enacted other provisions regarding EMCs in both commercial and industrial districts, the most pertinent of which in this case is that an "EMC shall be permitted as a wall sign, or an integrated part of the total sign surface of a free standing business sign." Thereafter, in 2007, the General Assembly amended the 1972 Billboard Act. Specifically, the Legislature added Tenn. Code Ann. § 54-21-122, which, in pertinent part, states that "[c]hangeable message signs with a digital display that meet all other requirements to this chapter are permissible[.]" Tenn. Code Ann. § 54-21-122(b) (Supp. 2007). Finally in 2009, the City implemented regulations, as detailed in section I of this opinion, that further restricted EMCs.

On appeal, Lamar contends that the 2007 amendment to the 1972 Billboard Act preempts the City's restrictions on billboards with digital displays. Specifically, Lamar argues that the trial court erred by failing to conclude that the City's "ban on billboards that display messages by means of digital display is in direct conflict with state law expressly permitting such activity." Lamar, however, has mischaracterized the City's zoning regulations with respect to billboards with digital displays. The City has *not* banned billboards with digital displays. On the contrary, billboards with digital displays are still permissible in Knoxville, so long as they comply with the City's zoning regulations. Indeed, the City's zoning regulations expressly allow billboards with digital displays in the form of EMCs, *i.e.*, signs "which use[ ] a bank of lights that can be individually lit to form copy such as words, letters, logos, figures, symbols, illustrations, or patterns to form a message without altering the sign face." Furthermore, while the City imposes certain regulations on the use of EMCs, in particular limiting where they can be located, such restrictions are well within the City's discretion under Tenn. Code Ann. § 13-7-209 (1999), which states, in pertinent part, as follows:

> Whenever the regulations made under authority of this part and part 3 of this chapter require a greater width or size of yards, court or other open spaces, or required a lower height of buildings or less number of stories, or require a greater percentage of lot to be left unoccupied, or *imposed other higher standards than are required in any other statute, the provisions of the regulations made under authority of this part and part 3 of this chapter shall govern.*

(Emphasis added.) Pursuant to the said statute, the "higher standards" for billboards with digital displays in the City's zoning regulations would subsequently govern over the far more general language of Tenn. Code Ann. § 54-21-122(b), which merely permits billboards with digital displays. Ultimately, Lamar has misinterpreted the City's zoning regulations for billboards with digital displays, which type of billboards are clearly still permitted subject to restrictions the City has the statutory right to enact. We simply find no conflict between the City's zoning regulations and Tenn. Code Ann. § 54-21-122(b). As a result, we conclude that Lamar has failed to show any genuine issue of material fact with respect to the alleged preemption of the City's regulations by Tenn. Code Ann. § 54-21-122. Accordingly, the trial court correctly denied Lamar's motion for summary judgment on this ground.

# V.

Lamar argues that it should be permitted to expand or reconstruct its preexisting nonconforming billboards at 6739 Kingston Pike and 406B North Peters Road pursuant to the "grandfather clause" exceptions contained in Tenn. Code Ann. § 13-7-208(b)-(d). Those provisions state, in pertinent part, the following:

> (b)(1) In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions, and such zoning restrictions differ from zoning restrictions imposed after the zoning change, then any industrial, commercial or business establishment in operation, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted; provided, that no change in the use of the land is undertaken by such industry or business.
>
> (2) When the use permitted to continue to expand, or to be rebuilt pursuant to any subsection of this section is an off-premises sign, such use shall not preclude any new or additional conforming use or structure on the property on which the sign structure is located or on any adjacent property under the same ownership; provided, however, that any such new or additional use or structure does not result in any violations of the applicable zoning restrictions other than those nonconformities associated with the off-premises sign as allowed under this subdivision (b)(2).
>
> (c) Industrial, commercial or other business establishments in operation and permitted to operate under zoning regulations or exceptions thereto in effect immediately preceding a change in zoning shall be allowed to expand operations and construct additional facilities which involve an actual continuance and expansion of the activities of the industry or business which were permitted and being conducted prior to the change in zoning; provided, that there is a reasonable

15

amount of space for such expansion on the property owned by such industry or business situated within the area which is affected by the change in zoning, so as to avoid nuisances to adjoining landowners. No building permit or like permission for construction or landscaping shall be denied to an industry or business seeking to expand and continue activities conducted by that industry or business which were permitted prior to the change in zoning; provided, that there is a reasonable amount of space for such expansion on the property owned by such industry or business situated within the area which is affected by the change in zoning, so as to avoid nuisances to adjoining landowners.

(d)(1) Industrial, commercial, or other business establishments in operation and permitted to operate under zoning regulations or exceptions thereto immediately preceding a change in zoning shall be allowed to destroy present facilities and reconstruct new facilities necessary to the conduct of such industry or business subsequent to the zoning change; provided, that no destruction and rebuilding shall occur which shall act to change the use classification of the land as classified under any zoning regulations or exceptions thereto in effect immediately prior to or subsequent to a change in the zoning of the land area on which such industry or business is located. No building permit or like permission for demolition, construction or landscaping shall be denied to an industry or business seeking to destroy and reconstruct facilities necessary to the continued conduct of the activities of that industry or business, where such conduct was permitted prior to a change in zoning; provided, that there is a reasonable amount of space for such expansion on the property owned by such industry or business situated within the area which is affected by the change in zoning, so as to avoid nuisances to adjoining landowners.

Tenn. Code Ann. § 13-7-208(b)-(d). These protections are extended to off-site signs pursuant to Tenn. Code Ann. § 13-7-208(h), which states:

Subsections (b)-(d) shall apply to an off-site sign which, for the purposes of this subsection (h), means any sign that

advertises or gives direction to any business, product, service, attraction, or any other purpose or interest, other than the industrial, commercial or other business establishment located on the site where the sign is located[.]

Tenn. Code Ann. § 13-7-208(h). Both of the billboards in this appeal qualify as off-site signs, a fact that Lamar readily concedes.

Pursuant to Tenn. Code Ann. § 13-7-208(j),[4] the "grandfather clause" exceptions applicable to off-site signs via Tenn. Code Ann. § 13-7-208(h) are not available in any home rule municipality where the local legislative body has not adopted such provisions. "The City of Knoxville . . . adopted home rule in August 1954, shortly after it became available[.]" *Civil Serv. Merit Bd. of City of Knoxville v. Burson*, 816 S.W.2d 725, 727 (Tenn. 1991). There is no indication in the record that the City has ever opted in and approved these "grandfather clause" subsections of Tenn. Code Ann. § 13-7-208 with respect to off-site signs.

In its reply brief, Lamar contends that Tenn. Code Ann. § 13-7-208(j) is not applicable to the present case because "Lamar is not seeking to expand the size of the outdoor advertising sign faces in question." In this instance, Lamar has read a concept into Tenn. Code Ann. § 13-7-208(h) that does not exist. "When interpreting statutes, a reviewing court must ascertain and give effect to the legislative intent *without restricting or expanding the statute's intended meaning*." *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998)) (emphasis added). When construing the clear wording of Tenn. Code Ann. § 13-7-208(h), we simply find no indication that Tenn. Code Ann. § 13-7-208(h) exclusively pertains to the *expansion* of off-site signs. Rather, Tenn. Code Ann. § 13-7-208(h) merely extends the provisions of Tenn. Code Ann. § 13-7-208(b)-(d) to off-site signs before providing additional restrictions pertaining to the expansion of off-site signs. Tenn. Code Ann. § 13-7-208(h) is relevant to the present case, even though the City's status as a home rule municipality subsequently renders the provisions of that subsection not applicable under Tenn. Code Ann. § 13-7-208(j). Thus, we conclude that Lamar has failed to show any genuine issue of material fact regarding the "grandfather clause" exceptions contained in Tenn. Code Ann. § 13-7-208(b)-(d), and the trial court correctly denied Lamar's motion for summary judgment on this point

---

[4] "The provisions of subsections (g), (h) and (i) do not apply to any home rule municipality; provided, however, that subject to the approval of the local legislative body, a home rule municipality may opt into the provisions of these subsections." Tenn. Code Ann. § 13-7-208(j).

Lamar claims that the trial court erred by stating that digital displays on billboards were prohibited by Article V, section 10(A)(3) of the City's zoning regulations by being signs with moving parts and Article V, section 10(A)(4) for being signs having flashing or blinking lights. Lamar contends that the lower court ruling on this issue was incorrect for three separate reasons: (1) the City's original complaint, first amended complaint, and responsive pleading to Lamar's complaint never cited to section 10(A)(3) of the City's zoning regulations; (2) the City never pled section 10(A)(3) as a claim or alleged it as an affirmative defense; and (3) Scott Brenneman, the Rule 30.02(6) designee of the City regarding billboard policies and procedures since 2004, testified that Lamar did not violate either section 10(A)(3) or 10(A)(4) and that a sign does not necessarily feature flashing or blinking lights simply because it changes messages electronically. After reviewing the trial court's memorandum opinion and order, we find that these arguments are without merit.

To start, Lamar has misrepresented the trial court's memorandum opinion and order with respect to this issue. Specifically, Lamar is incorrect when it says that the court stated that "digital displays were prohibited by the City of Knoxville in 2006 as 'signs with moving parts' . . . and as signs with 'flashing or blinking lights[.]' " The court did not make these statements. Rather, the trial court noted that digital displays were not permitted in certain situations, before stating the following: "In 2006, the City prohibited signs with moving parts. . . . The City also prohibited signs, other than EMCs, from having 'flashing or blinking lights[.]' " Under the clear terms of the City's zoning regulations as they were in 2006, both of those statements are essentially correct. All signs, digital or not, were precluded from having moving parts pursuant to Article V, section 10(A)(3). Further, only EMCs and documented historic or reproduction signs located in an H-1 District with a certificate of approval from the City's Historic Zoning Commission were permitted to have flashing or blinking lights under Article V, section 10(A)(4). Given these clearly worded subsections of the City's zoning regulations and the unambiguous statements by the trial court that we have quoted, Lamar's contention that the trial court stated the City somehow banned billboards with digital displays because of moving parts, flashing lights, or blinking lights is simply incorrect.

Next, the trial court explained that EMCs were only permissible as wall signs or freestanding business signs, an accurate statement under the City's zoning regulations as they were in 2006. Thereafter, the trial court pointed out that neither of Lamar's billboards would have been permissible as an EMC, because neither was a wall sign or freestanding business sign. That entire section of the memorandum opinion and order reads as follows:

Even a cursory glance at either version of the Code demonstrates that digital displays were previously and currently remain prohibited in certain circumstances. In 2006, the City prohibited signs with moving parts. (Code, Sec. 10(A)(3)). The City also prohibited signs, other than EMCs, from having "flashing or blinking lights." (*Id.*, Sec. 10(A)(4)). EMCs were only permissible as either a "wall sign" or a "freestanding business sign." (*Id.*, Sec. 10(E)(1)(e)(4)). Lamar's billboards do not qualify as either a wall sign or a freestanding business sign under Article II's definitions. Thus, Lamar's billboards could not have been permissible as an EMC at the time it sought to convert the billboards.

The last three sentences, which explain why Lamar's billboards were not EMCs at the time of the intended conversion, constitute the operative portion of that paragraph, and the trial court could have reached the conclusion therein without any discussion of section 10(A)(3). As a result, we do not believe that the trial court's cursory mention of section 10(A)(3) should in any way prejudice the City simply because the City never referenced that specific section of the zoning regulations in its complaint, first amended complaint, or responsive pleading. It appears quite clear to us that section 10(A)(3) was inconsequential to the trial court's decision. Furthermore, we find it evident the trial court concluded that Lamar's billboards were prohibited from featuring flashing or blinking lights because they did not qualify as EMCs, pursuant to section 10(A)(4), since neither was a wall sign or free standing business sign, pursuant to section 10(E)(1)(e)(4). In the end, both of those sections of the City's zoning regulations were referenced by the City in both its complaint and first amended complaint.[5]

---

[5] While the City did not cite section 10(E)(1)(e)(4) specifically in its complaint or first amended complaint, the City did mention Article V, section 10(E) of the zoning regulations. Tennessee adheres to a liberal notice pleading standard, and providing notice of the issues presented to the opposing party and court is the primary purpose of pleadings. *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426-27 (Tenn. 2011). "The object and purpose of any pleading is to give notice of the nature of the wrongs and injuries complained of with reasonable certainty, and notice of the defenses that will be interposed, and to acquaint the court with the real issues to be tried." *Hammett v. Vogue, Inc.*, 165 S.W.2d 577, 579 (Tenn. 1942). In this instance, we conclude that the City's reference to Article V, section 10(E) provided sufficient notice to Lamar as to what portion of the zoning regulations the City relied upon in making its argument.

Lamar also contends that the trial court erred because Scott Brenneman, in his capacity as a Tenn. R. Civ. P. 30.02(6) designee,[6] testified that Lamar did not violate either section 10(A)(3) or 10(A)(4). Specifically, Lamar asserts that Brenneman indicated that "Lamar did not violate either Section 10(A)(3) or Section 10(A)(4) of the City Code because these two sections specifically excepted signs operated by electronic means, including billboards with digital displays, from its coverage." Despite Brenneman's testimony, neither of Lamar's billboards qualified as valid EMCs prior to the initiation of this case. Rather, Lamar was in the process of converting both billboards into EMCs when this action commenced. Further, as discussed in the preceding section of this opinion, Lamar is not allowed to rely upon "grandfather clause" exceptions contained in Tenn. Code Ann. § 13-7-208 to repurpose its legal preexisting nonconforming billboards into billboards with digital displays because of the City's status as a home rule municipality. While Brenneman's testimony is accurate in a general sense, *i.e.*, that sections 10(A)(3) and 10(A)(4) carve out exceptions for EMCs, neither of those sections of the zoning regulations are applicable to Lamar's case because Lamar's signs are not EMCs. Thus, Brenneman's statements do not contradict our position on this issue.

Lamar next states that Brenneman "testified that just because a message changes electronically on a sign does not mean the sign is blinking or flashing." While, Lamar has liberally construed Brenneman's testimony,[7] Brenneman was merely proffering an opinion in his capacity as a Tenn. R. Civ. P. 30.02(6) designee. Moreover, Brenneman's agreement with the statement that a specific sign does not necessarily blink or flash when

---

[6] Tenn. R. Civ. P. 30.02(6) reads, in pertinent part, as follows:

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization.

[7] While discussing the Tennessee Theatre marquee sign, Lamar's counsel asked Brenneman, "And the fact that it changes messages doesn't mean it flashes or blinks or is intermittent, right?" In response, Brenneman simply responded, "Correct."

it changes messages electronically hardly constitutes a legal fact that would bind us when ruling on this issue. Ultimately, we are not persuaded by either Brenneman's response to Lamar's question or Lamar's attempt to conflate Brenneman's one-word answer into a larger statement.

Finally, Lamar references an affidavit by William Ripp, Lamar's vice president for digital development, who "testified that under industry standards and prevailing regulatory guidance billboards with digital technology do not contain 'flashing or blinking lights.' " As evidence of this contention, Ripp references memoranda from 1996 and 2007 by the Federal Highway Administration (FHA).[8] Ripp's affidavit quotes the following excerpt from the 2007 memorandum:

> Proposed laws, regulations, and procedures that would allow permitting [changeable electronic variable message signs] subject to acceptable criteria . . . *do not violate* a prohibition against "intermittent" or "flashing" or "moving" lights as those terms are used in the various [Federal/State Agreements] that have been entered into during the 1960s and 1970s.

(Emphasis in original.) Using the above language, Lamar would have us believe that the FHA has said that changeable electronic variable message signs, *i.e.*, signs with digital displays, do not have flashing or blinking lights. Once again, Lamar has liberally construed evidence to fit its argument. Pursuant to the Federal Highway Beautification Act, Tennessee's Federal/State Agreement prohibits signs that contain any flashing or intermittent light. Nevertheless, as the above-quoted language indicates, regulations that permit digital signs, subject to acceptable criteria, would not violate a general prohibition on intermittent, flashing, or moving light. Accordingly, the City carved out such an exception in its zoning regulations under section 10(A)(4). Under the 2004 zoning regulations, section 10(A)(4) permits flashing or blinking lights for both EMCs and "documented historic or reproduction sign[s] located in an H-1 . . . district, which ha[ve] received a certificate of approval[.]" Under the 2009 zoning regulations, section 10(A)(4) permits "scrolling, intermittent, flashing, running or blinking lights or animated illumination" for "documented historic or reproduction sign[s] located in an H-1 . . . District, which ha[ve] received a certificate of appropriateness from the Knoxville Historic Zoning Commission," as well as "sign[s] within the D-1 . . . District, which

---

[8] The 2007 memorandum was drafted to clarify the 1996 memorandum regarding the FHA's position on off-premise changeable message signs. As a result, our analysis on this issue will focus exclusively on the 2007 memorandum.

ha[ve] received approval from the Downtown Design Review Board as being compatible and in character with the Downtown Design guidelines and surrounding established development." Ultimately, Lamar's billboards in this case would not qualify for any of these exceptions under section 10(A)(4) of either version of the City's zoning regulations, as they were not EMCs, were not located in an H-1 District, were not located in a D-1 District, and never received a certificate of appropriateness from the Historic Zoning Commission or approval from the Downtown Design Review Board.

In summary, we hold that the trial court correctly determined that Lamar's billboards were prohibited from featuring flashing or blinking lights pursuant to section 10(A)(4) and that the trial court's cursory mention of section 10(A)(3) was inconsequential to its ruling and should not prejudice the City as a result. In addition, we conclude that Brenneman's testimony was merely his non-binding opinion and that Lamar has misconstrued the FHA's position on off-premise changeable message signs in an effort to undermine the trial court's reliance on section 10(A)(4) as part of its ruling. Accordingly, we conclude that this issue is without merit.

**VII.**

Lamar also contends that the trial court erred in holding that the City's zoning regulations did not unlawfully restrict commercial and noncommercial speech in violation of the First Amendment and Article I, Section 19 of the Tennessee Constitution. With this type of claim, we must first analyze whether the applicable regulation is a "content-neutral time, place, and manner regulation or if it is a content-based restriction." *Am. Show Bar Series, Inc. v. Sullivan Cnty.*, 30 S.W.3d 324, 333 (Tenn. Ct. App. 2000) (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986)) (internal quotation marks omitted). "If the ordinance is directed at content of the . . . message conveyed . . . then the ordinance is presumptively invalid and will be subject to strict scrutiny." *City of Cleveland v. Wade*, 206 S.W.3d 51, 56 (Tenn. Ct. App. 2006) (citing *City of Renton*, 475 U.S. at 47). However, "if the ordinance is justified without reference to the content of the regulated speech, or the ordinance serves a purpose that is unrelated to the contents of the material, the ordinance is considered content-neutral." *City of Cleveland*, 206 S.W.3d at 56 (quoting *Ward v. Rock Against Racism*, 491 U.S 781, 791 (1989)) (internal quotation marks omitted). Further, "if the ordinance is targeted at combating the negative secondary effects of the protected expression, then it may be upheld as a reasonable time, place, and manner restriction." *City of Cleveland*, 206 S.W.3d at 56 (citing *City of Renton*, 475 U.S. at 49).

In its brief, Lamar specifically argues that the City's "Ordinance No. O-241-04 does not directly advance a substantial governmental interest, and moreover, the

ordinance is more extensive than necessary to serve the governmental interest at issue."[9] In addition, Lamar states that "the City of Knoxville has never articulated the governmental interest that is allegedly served by the City of Knoxville's ban on billboards with digital displays with any specificity beyond simply boilerplate language evidencing the absence of a legitimate governmental interest." Further, Lamar asserts that "any purported governmental interest served by the ordinance[ ] is undermined by the fact that signs utilizing digital technology have been permitted when the City's interests are served." Finally, Lamar contends that "the ordinance distinguishes between permissible and impermissible signs at a particular location by reference to their content and, in application, the ordinance favors commercial speech over non-commercial speech" in violation of the First Amendment. We disagree with all of the above.

To start, we are not persuaded by Lamar's conclusory allegation that the City's regulations are "undermined by the fact that signs utilizing digital technology have been permitted when the City's interests are served." As proof of this argument, Lamar highlights two entities that the City has permitted to operate EMCs within an H-1 District: the Tennessee Theatre and the Bijou Theatre. The record reflects, however, that these EMCs, unlike either of Lamar's signs, were preexisting nonconforming digital displays that were valid under the City's 2004 zoning regulations. Further, these EMCs were on-site business signs, unlike either of Lamar's signs, and had the requisite certificates of appropriateness from the Historic Zoning Commission. While Lamar continually alludes to some self-serving economic motivation behind the City's decision to grant certificates of appropriateness for these signs, we simply cannot find any evidence in the record to support Lamar's generalized allegation. On the contrary, the record reveals a clear set of guidelines for the Historic Zoning Commission to follow when deciding whether to issue or deny a certificate of appropriateness. Specifically, Article IV, section 5.1(J) of the City's zoning regulations lists the following criteria that the Historic Zoning Commission should give primary consideration when rendering a decision:

> (1) Historic or architectural value of the present structure, object or building;

---

[9] As discussed earlier in this opinion, that ordinance amended Article V, section 10 of the City's zoning regulations and provided additional restrictions for electronically operated message boards. Most pertinent to Lamar's claim, the ordinance stated that only EMCs could feature red, green, yellow, amber, or blue lights. In addition, that ordinance restricted flashing or blinking lights to EMCs and signs in the H-1 District that had received a certificate of approval from the City's Historic Zoning Commission.

(2) The relationship of the exterior architectural features of such structure to the rest of the structures, to the surrounding area, and to the character of the district;

(3) The general compatibility of exterior design, arrangement, texture, and materials to be used; and

(4) Any other factor, including aesthetic, which is justified by the historic character of the proposed district or is reasonably related to the purposes of this section.

Further, as the City points out in its brief, individual sections of the H-1 District offer additional guidelines in an effort to preserve the historic nature of those specific areas.[10] Ultimately, we find that there is a clear framework in place to regulate the manner in which an advertisement is conveyed in an H-1 District without regard to the content of the message being conveyed. Thus, we conclude that this ordinance is content-neutral.

While only Ordinance No. O-241-04 is directly referenced in this section of Lamar's brief, additional ordinances are clearly implicated in the course of Lamar's argument on this issue. In particular, Lamar generally questions the process by which parties can obtain approval from the Downtown Design Review Board to have a digital display in the D-1 District. Thus, Lamar's First Amendment argument also requires an examination of Ordinance No. O-37-09, which provides an exception, subject to approval by the Downtown Design Review Board, for signs with digital displays in the D-1 District. Similar to its argument regarding exceptions for EMCs in the H-1 District, Lamar contends that the City has granted exceptions in the D-1 District to entities that would serve the City's economic interests. In support of this argument, Lamar highlights two entities that the City has permitted to operate EMCs within the D-1 District: the Knoxville Tourism and Sports Office and the Knoxville Convention Center. As with the two exceptions we discussed in the H-1 District, these EMCs in the D-1 District were also preexisting nonconforming digital displays that were valid under the City's 2004 zoning regulations, unlike either of Lamar's signs. In addition, these EMCs were on-site business signs, unlike either of Lamar's signs, and had the requisite approval from the Downtown Design Review Board. Finally, the Downtown Design Guidelines, which the City adopted in 2008 through Ordinance No. O-166-08, provide criteria for the Downtown Design Review Board to consider when deciding whether to grant a

---

[10] Knoxville Metropolitan Planning Commission, *Design Guidelines for Designated Historic Areas*, www.knoxmpc.org/historic/areas/hisareas.htm (last visited Jan. 12, 2016).

24

certificate of appropriateness.[11]  Accordingly, we conclude that this ordinance is also a content-neutral regulation.

Having established that both ordinances are content-neutral, we must now determine whether they are constitutional.  This Court has previously held that a content-neutral statute is constitutional if "(1) it is within the constitutional powers of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on First Amendment freedoms is no greater than is necessary to further that interest."  *Am. Show Bar Series, Inc.*, 30 S.W.3d at 335 (citing *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968)).  Starting with the first part of this test, the City certainly has the power to enact these ordinances.  As previously discussed in this opinion, the City is allowed to require "higher standards" for billboards with digital displays in its zoning regulations pursuant to Tenn. Code Ann. § 13-7-209.  Second, the City clearly articulated the governmental interests behind its decision to regulate signs, billboards, and other advertising structures at the very beginning of Article V, section 10 of the City's zoning regulations with the following language:

> These conditions are established as a reasonable and impartial method of regulating advertising structures and display surface area permitted, in order to insure safe construction; *to insure light, air, and open space; to reduce hazards*; *to prevent the accumulation of trash; and to protect property values of the entire community*.

(Emphasis added.)  As we have previously explained in this opinion, the United States Supreme Court has repeatedly held that traffic safety and esthetics are valid justifications for regulating advertising.  *Lorillard Tobacco Co.*, 533 U.S. at 551 (citing *Metromedia, Inc.*, 453 U.S. at 507-08; *St. Louis Poster Adver. Co.*, 249 U.S. at 274; *Thomas Cusack Co.*, 242 U.S. at 529-31).  Thus, these ordinances clearly further substantial governmental interests.  Third, we find that these ordinances are unrelated to the suppression of free expression, as they aim to combat the secondary effects of digital advertising by helping prevent traffic hazards and maintain esthetics.

The final part of this test analyzes whether the ordinances are narrowly tailored and not overly broad.  In *Ward v. Rock Against Racism*, the United States Supreme Court explained that a narrowly tailored time, place, and manner regulation,

---

[11] Knoxville Metropolitan Planning Commission, *Downtown Knoxville Design Guidelines*, archive.knoxmpc.org/plans/dguides/downtown.pdf (last visited Jan. 12, 2016).

need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

491 U.S. at 798-800 (footnotes, internal quotation marks, and citations omitted). In this case, the City did not enact an outright ban on all digital billboards, despite Lamar's repeated attempts to characterize the City's regulations as such. On the contrary, Article V, section 10 of the City's zoning regulations contains several exceptions, as explained earlier in this opinion, which, in particular, would allow preexisting, nonconforming EMCs to continue in operation, EMCs in an H-1 District after approval from the City's Historic Zoning Commission, and EMCs in a D-1 District after approval from the Downtown Design Review Board. Further, the City's zoning regulations have not prevented Lamar from utilizing its numerous vinyl, non-electronic billboards, which are certainly capable of conveying messages of Lamar's clients. Ultimately, Lamar has viable alternative means of communicating to the public via its vinyl billboards. Accordingly, we find that these regulations are valid content-neutral time, place, and manner restrictions on digital advertising.

Finally, we will address Lamar's contention that the trial court should have examined these ordinances under the constitutional test set forth in ***Central Hudson Gas & Electric Corporation v. Public Service Commission of New York***. 447 U.S. 557 (1980). Lamar argues that the four-part analysis[12] from ***Central Hudson*** should apply

---

[12] "In commercial speech cases . . . a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both

26

because this case involves commercial speech.  To start, we agree with the trial court that the ***Central Hudson*** test employs the same level of intermediate scrutiny as the time, place, and manner test that we have already applied in our analysis:

> As a practical matter, the choice of which test to apply makes little difference here: the two tests impose similarly demanding levels of "intermediate scrutiny," and, as relevant to this dispute, both tests impose similar requirements: under the "commercial speech" test, the restrictions must "directly advance" a "substantial" governmental interest, whereas under the "time, place, and manner" test, they must be "narrowly tailored" to a "significant" governmental interest.

***Hucul Adver., LLC v. Charter Twp. of Gaines***, 748 F.3d 273, 276 (6th Cir. 2014) (internal citations omitted).  Indeed, the United States Supreme Court has previously held that the ***Central Hudson*** "framework for analyzing regulations of commercial speech . . . is 'substantially similar' to the test for time, place, and manner restrictions." ***Lorillard Tobacco Co.***, 533 U.S. at 554 (citing ***Bd. of Trustees of State Univ. of N.Y. v. Fox***, 492 U.S. 469, 477 (1989)); *see also* ***San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.***, 483 U.S. 522, 537 n.16 (1987).  Nevertheless, we will show that the ***Central Hudson*** test renders the same result.

To start, both parties agree that the speech in question is neither unlawful nor misleading, so the first part of the ***Central Hudson*** test is satisfied.  Next, the City sets forth, in the preamble to Article V, section 10 of its zoning regulations, its governmental interests underlying its guidelines for signs, billboards, and other advertising structures.  Specifically, the City seeks "to insure light, air, and open space; to reduce hazards; to prevent the accumulation of trash; and to protect property values of the entire community."  Maintaining esthetics and promoting traffic safety are clearly the City's goals for these regulations.  Despite Lamar's attempt to dismiss the City's objectives as "boilerplate language," traffic safety and esthetics are still substantial matters justifying the City's regulation of advertising.  ***Lorillard Tobacco Co.***, 533 U.S. at 551 (citing ***Metromedia, Inc.,*** 453 U.S. at 507-08; ***St. Louis Poster Adver. Co.***, 249 U.S. at 274; ***Thomas Cusack Co.***, 242 U.S. at 529-31).  Thus, the second part of the ***Central Hudson*** test is satisfied.  Next, the City is correct in pointing out that "empirical evidence" is not required to prove whether a regulation directly advances the governmental interest

---

inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." ***Central Hudson Gas & Elec. Corp.***, 447 U.S. at 566.

asserted.  As the United States Supreme Court stated in *Lorillard Tobacco Company v. Reilly*:

> The third step of *Central Hudson* concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest. It requires that the speech restriction directly and materially advanc[e] the asserted governmental interest. . . . *We do not, however, require that empirical data come . . . accompanied by a surfeit of background information. . . . We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . to justify restrictions based solely on history, consensus, and simple common sense.*

533 U.S. at 555 (internal citations and quotation marks omitted; emphasis added).  This Court has already determined that "[b]illboards are intended to distract motorists' attention from the road to the content of the advertisement.  The visual clutter created by a collection of billboards could present a higher level of distraction and could arguably create a higher risk of traffic accidents." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 (Tenn. Ct. App. 2004) (citing *Metromedia*, 453 U.S. at 508-09)).  We agree with this observation and believe that regulating billboards with digital displays represents a common sense way the City can promote traffic safety and maintain the esthetics of the community.  As a result, the third part of the *Central Hudson* test is satisfied.

Finally, we must analyze whether the City's regulations are more extensive than necessary to serve its twin goals of promoting traffic safety and maintaining esthetics.  As we have already stated, Article V, section 10 of the City's zoning regulations contains exceptions[13] that would allow digital displays in certain circumstances: preexisting,

---

[13] Lamar quotes *Greater New Orleans Broadcasting Association v. United States*, 527 U.S. 173, 174 (1999)) in arguing that "the exceptions created by the City of Knoxville to the ordinance prohibiting billboards from utilizing digital technology 'is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it.' "  As we have already explained before, the four exceptions Lamar takes umbrage with were all permissible preexisting nonconforming digital displays, existed as on-site business signs, and had approval from a regulatory body that relied upon a set of articulated criteria for determining whether to grant an exception.  Beyond its generalized allegation that the City granted self-serving exceptions to its regulations, Lamar has offered no actual proof that the exceptions in the zoning regulations are "pierced by . . . inconsistencies."

nonconforming EMC, EMCs in an H-1 District after approval from a historic zoning commission, and EMCs in a D-1 District after approval from a review board.[14] These exceptions serve to limit the prevalence of digital displays around the City, while at the same time allowing both preexisting digital displays to continue in operation and new displays to be erected in specific areas after receiving approval from a regulatory body. As the United States Supreme Court has stressed,

> The last step of the *Central Hudson* analysis complements the third step, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it. We have made it clear that the least restrictive means is not the standard; instead, the case law requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends[.]

*Lorillard Tobacco Co.*, 533 U.S. at 556 (quoting *Greater New Orleans Broad. Ass. v. U.S.*, 527 U.S. 173, 188 (1999)) (internal citations and quotation marks omitted). In our view, the City's regulations for digital displays impose reasonable restrictions that still allow digital displays under certain situations. In addition, these regulations do not foreclose other methods of conveying messages to the public, in particular the continued use of vinyl, non-electronic billboards. Accordingly, we find that the City's regulations are not more extensive than necessary. Hence, the final part of the *Central Hudson* test is satisfied.

Whether under the time, place, and manner test or the *Central Hudson* test, we find that the City's regulations are constitutional. Thus, Lamar has failed to show any genuine issue of material fact regarding its argument that the City's zoning regulations unlawfully restrict commercial and noncommercial speech, and the trial court correctly denied Lamar's motion for summary judgment on this issue.

## VIII.

Lamar next asserts that the City's zoning regulations pertaining to billboards with digital displays constitute a prior restraint on speech in violation of the First Amendment

---

[14] Under Article V, section 10 of the City's zoning regulations, EMCs are also permitted when (1) functioning as changeable price signs, (2) designed as wall signs or integrated into part of the total sign surface of a free standing business sign, and (3) as part of a ground or monument sign.

to the United States Constitution and Article I, Section 19 of the Tennessee Constitution. "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969)) (internal quotation marks omitted). On appeal, Lamar argues that,

> [t]his ordinance[15] gave decision-makers the explicit and unrestricted authority to determine what parties would qualify for an exception to the ordinance through the City of Knoxville. Such members had unfettered authority and discretion to make decisions based on their own setoff criteria since no guidelines were ever explicitly set out as related to this authority. As such, the members were given the unbridled discretion over the grant of permits which numerous . . . courts have identified as constitutionally unacceptable.

(Footnote added.) With respect to digital displays, our review of the City's zoning regulations reveals two "decision-makers" entitled to provide approval for exceptions: the City's Historic Zoning Commission and Downtown Design Review Board. As we explained in the preceding section of this opinion, both bodies utilize a set of criteria when they determine whether to allow an exception for a digital display in an H-1 District or a D-1 District respectively. Specifically, the City's Historic Zoning Commission is controlled by the guidelines set forth in Article IV, section 5.1(J) of the City's zoning regulations, as well as district-specific guidelines enumerated by the MPC. The Downtown Design Review Board is bound by the Downtown Design Guidelines, which the City adopted in 2007. The standards controlling the City's Historic Zoning Commission and Downtown Design Review Board are clearly set forth in the record, despite Lamar's erroneous contention that "no guidelines were ever explicitly set out[.]" As a result, we conclude that Lamar's contention of "unfettered discretion" is without merit.

---

[15] Though Lamar fails to specify which ordinance it is referring to with respect to this issue, we will assume from the overall context of Lamar's argument that an ordinance "which restricted the use of real-time messaging or real-time advertising" concerns both Ordinance No. O-241-04 and Ordinance No. O-37-09, as these were two ordinances central to this appeal that created exceptions for digital displays subject to approval by a regulatory body.

We would also address Lamar's characterization of the trial court's disposition of this issue. Specifically, Lamar stated,

> [t]he Chancellor's skeletal analysis of the issue is fundamentally flawed in that the opinion disregards the material argument related to Lamar's constitutional rights by dispensing of the argument in such a cursory fashion. The Court does so without explanation as to the analysis of this issue and only vague reference to the record, evidencing the fact that no substantive review of the record or pertinent facts presented was undertaken in drafting the opinion.

We disagree. Moreover, we find it ironic that Lamar alleges a "cursory" analysis by the trial court, when Lamar's prior restraint arguments are in fact cursory in nature. Lamar consistently alleges that "decision-makers" had unlimited discretion when granting exceptions, without ever providing actual proof of such unlimited discretion. Even on appeal, Lamar's prior restraint argument is still devoid of supporting evidence. Rather, Lamar (1) alleges that City officials had "explicit and unrestricted authority" to grant exceptions and base those decisions "on their own setoff criteria;" (2) states that "[t]he boards and the MPC and City Council who handled the appeals from requests were clearly vested with the power and authority to determine what parties would be granted a permit;" (3) uses erroneous deposition testimony by Scott Brenneman and Mark Donaldson[16] to show that "there were no specific standards, factors, or guidelines that had ever been adopted to assist in determining when a grant of permit in this context would be appropriate;" and (4) references four digital displays,[17] which we have already explained qualified for valid exceptions, as further proof of the City's "unlimited

---

[16] In answering Lamar's questions during their depositions, Brenneman and Donaldson overlook the fact that the City's Historic Zoning Commission is controlled by the guidelines set forth in Article IV, section 5.1(J) of the City's zoning regulations, as well as additional district-specific guidelines enumerated by the MPC. Similarly, both individuals fail to note that the Downtown Design Review Board is bound by the Downtown Design Guidelines when determining whether an exception would be appropriate. As we have explained multiple times, the City's Historic Zoning Commission and Downtown Design Review Board are the regulatory bodies tasked with providing approval for exceptions in an H-1 District and D-1 District respectively, and the record makes clear that standards are in place for each entity when considering an application for an exception. The mistaken testimony of both Brenneman and Donaldson does not change this reality.

[17] Again, these four displays are located at the Knoxville Convention Center, the Knoxville Tourism and Sports Office, the Tennessee Theatre, and the Bijou Theatre.

discretion in this area." However, none of this "evidence" is indicative of unfettered discretion sufficient to warrant a finding of prior restraint. On the contrary, Lamar simply relies upon conclusory allegations and clearly inaccurate testimony to make its case on this issue. Ultimately, we are not persuaded by Lamar's argument, which fails to show any genuine issue of material fact with respect to a prior restraint on speech. Accordingly, the trial court was correct to deny Lamar's motion for summary judgment on this basis.

## IX.

Lamar also contends that the trial court "erred in holding that the City's ban on utilizing digital technology on billboards [was] not ultra-vires and in excess of statutory authority because the ordinance fails to promote health, safety, morals, and welfare as prescribed by Tenn. Code Ann. § 13-7-[2]01 and the City's zoning charter." As the central part of its argument on this issue, Lamar maintains that "[b]illboards utilizing digital displays were effectively banned as a result of changes to the City's sign regulations in 2004." Once again, Lamar has mischaracterized the City's zoning regulations, as the City never banned billboards with digital displays. On the contrary, billboards with digital displays are still permissible in multiple situations: (1) preexisting nonconforming EMCs; (2) EMCs in an H-1 District with a certificate of appropriateness from the City's Historic Zoning Commission; (3) EMCs in a D-1 District with approval from the Downtown Design Review Board; (4) EMCs used as changeable price signs; (5) EMCs operating as wall signs; and (6) EMCs that are an integrated part of the total surface of free standing business signs.

While the City did decide to regulate the location and number of billboards with digital displays, we have previously explained that the City was entitled to do so pursuant to Tenn. Code Ann. § 13-7-201(a)(1) and Tenn. Code Ann. § 13-7-209. Further, we have already noted on multiple occasions that traffic safety and esthetics are valid justifications for regulating advertising. *Lorillard Tobacco Co.*, 533 U.S. at 551 (citing *Metromedia, Inc.*, 453 U.S. at 507-08; *St. Louis Poster Adver. Co.*, 249 U.S. at 274; *Thomas Cusack Co.*, 242 U.S. at 529-31). Moreover, the City made clear its intent to promote safety and maintain esthetics with these regulations by inserting the following language at the very beginning of Article V, section 10 of the its zoning regulations: "These conditions are established as a reasonable and impartial method of regulating advertising structures . . . in order to . . . insure light, air, and open space; to reduce hazards; to prevent the accumulation of trash; and to protect property values of the entire community." Ultimately, the City has regulated digital displays pursuant to its statutory authority, and its regulations are clearly intended to promote the public health, safety, order, prosperity and general welfare. Thus, we find that Lamar has failed to show a genuine issue of

material fact with respect to its ultra vires argument. The trial court properly denied Lamar's motion for summary judgment on this ground.

## X.

Lamar next argues that the trial court "erred in holding that [the] City's ban on digital displays on billboards did not violate the due process and equal protection guarantees of Article I, Section 8 of the Tennessee Constitution." With respect to Lamar's due process argument under Article I, Section 8 of the Tennessee Constitution, the Supreme Court has previously stated,

> Even though the right to acquire, possess, and use property remains fundamental, *a person's possession and use of property is not beyond the reach of the appropriate exercise of the state's power to protect the health, safety, and welfare of its citizens*. We have noted that

>> Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the Legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient.

*Brundage v. Cumberland Cnty.*, 357 S.W.3d 361, 365-66 (Tenn. 2011) (quoting *Spencer-Sturla Co. v. City of Memphis*, 290 S.W. 608, 612 (Tenn. 1927)) (internal citations omitted; emphasis added). Pursuant to Tenn. Code Ann. § 13-7-201(a)(1), the City is entitled to regulate billboards in its community "[f]or the purpose of promoting the public health, safety . . . and general welfare." Again, maintaining esthetics and promoting traffic safety are substantial justifications for the City's regulation of advertising. *Lorillard Tobacco Co.*, 533 U.S. at 551 (citing *Metromedia, Inc.*, 453 U.S. at 507-08; *St. Louis Poster Adver. Co.*, 249 U.S. at 274; *Thomas Cusack Co.*, 242 U.S. at 529-31). In this case, the City has enacted permissible limitations on digital displays for the purpose of maintaining esthetics and promoting safety, as set forth in the preamble to Article V, section 10 of the City's zoning regulations. Ultimately, these regulations for digital displays represent an "appropriate exercise of the state's power to protect the health, safety, and welfare of its citizens," given binding authority from the United States

Supreme Court and the City's statutory rights pursuant to Tenn. Code Ann. § 13-7-201 *et seq.*

As proof of its argument that the City's regulations are "not sufficiently reasonable," Lamar cites to the exceptions granted to the Knoxville Convention Center, the Knoxville Tourism and Sports Office, the Tennessee Theatre, and the Bijou Theatre. Yet again, Lamar alleges some self-serving interest for the City underlying these exceptions, while simultaneously overlooking the reality that the digital displays in all four instances were preexisting nonconforming structures that were on-site business signs, valid under the City's 2004 zoning regulations, and approved by either the Historic Zoning Commission or the Downtown Design Review Board. Contrary to Lamar's contention that "[t]here is no reasonable basis presented anywhere within the record to explain the numerous exceptions to the ban granted for digital displays on signs owned or operated by or for the City," the evidence clearly indicates otherwise.

Lamar also maintains that the trial court "erred in stating that there was no violation of the Equal Protection Clause since the City's implementation has resulted in discriminatory approval of . . . permits to parties that align their interest with the City." The Supreme Court has previously stated that "[t]he equal protection provisions of the federal and state constitutions demand that persons similarly situated be treated alike." **Gallaher v. Elam**, 104 S.W.3d 455, 461 (Tenn. 2003) (citing **Tenn. Small Sch. Sys. v. McWherter**, 851 S.W.2d 139, 153 (Tenn. 1993)). In the present case, there is simply no indication that "similarly situated" entities have been treated differently, because the entities that received exceptions are not "similarly situated" with Lamar. Specifically, the Knoxville Convention Center, the Knoxville Tourism and Sports Office, the Tennessee Theatre, and the Bijou Theatre all feature digital displays that were preexisting, nonconforming, and valid under the 2004 zoning regulations. Lamar cannot say the same about either one of its signs. Further, all four of the digital displays receiving exceptions are located in zoning districts that, unlike Lamar's signs, permit EMCs. Finally, all four exempt digital displays, unlike Lamar's signs, are on-site business signs. While all of these signs are similar in a general sense, *i.e.*, they are all signs, it would be illogical to conclude that they are "similarly situated" given the obvious differences between them as we have repeatedly articulated. Hypothetically speaking, had Lamar's signs been on-site business signs that were preexisting, nonconforming, and valid under the 2004 regulations, and located within a district that permitted EMCs, then they would be "similarly situated" with the four exempt digital displays. In that case, if those signs had been denied the right to feature digital displays, then Lamar would probably have a valid equal protection argument. Reality, however, does not mirror this hypothetical scenario. Lamar's signs are simply different from the four signs with exceptions that Lamar repeatedly offers as evidence of injustice in this case. Accordingly, Lamar has failed to

show a genuine issue of material fact with respect to its due process and equal protections arguments. Thus, the trial court was correct in denying Lamar's motion for summary judgment on this ground.

## XI.

Lamar goes on to allege that the trial court "erred in holding that there was no support for Lamar's assertion that the Knoxville City Ordinance was vague and overbroad." This Court has previously stated that "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *City of Cleveland*, 206 S.W.3d at 58 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)) (internal quotation marks omitted). In addition, an ordinance is "unconstitutionally vague when a person of common intelligence must necessarily guess at its meaning." *City of Cleveland*, 206 S.W.3d at 58 (quoting *Broadrick v. Okla.*, 413 U.S. 601, 607 (1973)) (internal quotation marks omitted).

In its brief, Lamar accuses the trial court of failing "to thoroughly review the arguments of counsel" and "misstat[ing] the reality of Lamar's assertions." In support of its accusations, Lamar references its memorandum of law in support of its motion for summary judgment, in which the following is stated:

> The City of Knoxville Zoning Ordinance threatens those who defy its restrictions with criminal liability, civil fines, and forfeiture of property. Several portions of the Sign Code, however, do not afford those who would post outdoor advertising structures a fair opportunity to know what conduct will expose them to such liability.

As proof of this claim, Lamar specifically references Article V, section 10(A)(4) and Article V, section 10(E)(1)(e). Lamar believes that reviewing both of these portions of the City's zoning regulations will "illuminate the vagueness and significant potential for interpretation that each encompassed." However, beyond this conclusory allegation of "vagueness and significant potential for interpretation," Lamar fails to explain exactly how these provisions of the City's zoning regulations fail to give individuals of common intelligence a fair opportunity to know what conduct is prohibited. Rather, on appeal, Lamar rehashes its generalized argument from below: Article V, section 10(A)(4) and Article V, section 10(E)(1)(e) are vague and would subsequently allow "discretionary implementation of policies by the Zoning Authority." At both the trial court level and now on appeal, Lamar has essentially pointed to two portions of the City's zoning

regulations, said those regulations were overbroad and void for vagueness, and made absolutely no effort to support its argument with any actual evidence.

In its brief, Lamar chastises the trial court for failing to "cite to the majority of [the] voluminous record," before stating that "[i]n directing the [trial court] to these provisions[18] and the relevant caselaw on the issue, no additional support should have been necessary for the [trial court] to make a determination." We disagree. Under either the 2004 or the 2009 version of the City's zoning regulations, we find that neither Article V, section 10(A)(4) nor Article V, section 10(E)(1)(e) lacks the type of clarity that would force a person of common intelligence to "guess at its meaning." *City of Cleveland*, 206 S.W.3d at 58. On the contrary, both Article V, section 10(A)(4) and Article V, section 10(E)(1)(e) set forth straightforward restrictions for digital displays that make sense in the overall context of the City's zoning regulations. Furthermore, "[a] statute that is not directed at protected expression but rather the manner in which the expression is presented may be overbroad only if the overbreadth is real and substantial in relation to the statute's plainly legitimate sweep." *Am. Show Bar Series, Inc.*, 30 S.W.3d at 339 (quoting *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 525-26 (Tenn. 1993)) (internal quotation marks omitted). Article V, section 10(A)(4) and Article V, section 10(E)(1)(e) are clearly directed at the manner in which speech is conveyed, and Lamar has simply failed to show how either portion of the City's zoning regulations is overbroad, much less how any overbreadth is real and substantial. Accordingly, we find that Lamar has failed to show any genuine issue of material fact for its vagueness argument and conclude that the trial court was correct in denying Lamar's motion for summary judgment on this issue.

## XII.

Lastly, Lamar contends that it is entitled to damages from the City "as a result of the constitutional violations arising from the City's enactment and enforcement of the ban on digital displays on billboards." As we have explained throughout this opinion, the City's regulations for billboards with digital displays are valid restrictions, which the City was statutorily permitted to make, aimed at the substantial governmental interests of

---

[18] Lamar is not entirely clear as to what provisions of the City's zoning regulations it is referring to with respect to this issue. While it does cite directly to Article V, section 10(A)(4) and Article V, section 10(E)(1)(e) of the City's zoning regulations, Lamar also indicates that "several portions of the Sign Code fail to afford this reasonable opportunity [to know what is prohibited] based on vague provisions." In light of Lamar's failure to explain what it means by "several portions of the Sign Code," we will limit our analysis of this issue to Article V, section 10(A)(4) and Article V, section 10(E)(1)(e).

maintaining esthetics and promoting traffic safety. Furthermore, these regulations were content-neutral time, place, and manner restrictions that did not infringe upon Lamar's First Amendment rights or violate the due process and equal protection guarantees of Article I, Section 8 of the Tennessee Constitution. Simply put, Lamar is not entitled to damages for being compelled to abide by a valid regulatory framework that the City was certainly permitted to implement. Accordingly, we hold that Lamar's claim for damages is without merit.

## XIII.

The trial court's grant of summary judgment to the City of Knoxville and the denial of Lamar's motion for summary judgment are affirmed. Costs on appeal are assessed to the appellant, Lamar Tennessee, LLC dba Lamar Advertising of Knoxville. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE